ACCEPTED

FIFTH COURT OF APPEALS
DALLAS, TEXAS
12/31/2014 9:50:42 AM
LISA MATZ
CLERK

IN THE

COURT OF APPEALS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS

FOR THE FIFTH DISTRICT OF TEXAS 12/31/2014 9:50:42 AM

LISA MATZ
Clerk

AT DALLAS

---

VINCENT PASCO
APPELLANT

V.

THE STATE OF TEXAS
APPELLEE

---

CAUSE NUMBER: 05-14-00413CR

---

ON APPEAL FROM CAUSE NUMBER: F12-59001
CRIMINAL DISTRICT COURT NUMBER SEVEN
OF DALLAS COUNTY, TEXAS

---

APPELLANT'S BRIEF

---

Allan Fishburn
State Bar Number 07049110
211 N. Record
Suite 450
Dallas, Texas 75202
(214) 761-9170
allanfishburn@yahoo.com

IDENTITY OF THE COURT, PARTIES AND COUNSEL

THE COURT
Honorable Mike Snipes, Judge
Criminal District Court Number Seven
Dallas County, Texas

PARTIES

| | |
|---|---|
| VINCENT PASCO | Appellant |
| THE STATE OF TEXAS | State |

COUNSEL
Ms. Rita Gentile
Assistant District Attorney                                      Attorney for the State
133 N. Riverfront Boulevard
Dallas, Texas 75207

Ms. Kenna Miller
Assistant District Attorney                                      Attorney for the State
133 N. Riverfront Boulevard
Dallas, Texas 75207

Mr. Brett Martin
Public Defender Office                                      Attorney for the Defendant
133 N. Riverfront Boulevard
Dallas, Texas  75207

Ms. Janie Martin
Public Defender Office                                      Attorney for the Defendant
133 N. Riverfront Boulevard
Dallas, Texas  75207

Mr. Allan Fishburn
211 North Record
Suite 450                                      Attorney for Appellant
Dallas, Texas 75202

## TABLE OF CONTENTS

IDENTITY OF THE PARTIES                                    2

TABLE OF CONTENTS                                          3

INDEX OF AUTHORITIES                                       5

STATEMENT OF THE CASE                                      7

ISSUES PRESENTED                                           8

STATEMENT OF FACTS                                         9

POINT OF ERROR NUMBER ONE

THE EVIDENCE IS INSUFFICIENT TO
PROVE THE ELEMENT OF IDENTITY                             45

SUMMARY OF ARGUMENT                                       45

ARGUMENT                                                  46

POINT OF ERROR NUMBER TWO

THE TRIAL COURT ERRED BY INFORMING
THE JURY ABOUT GOOD CONDUCT TIME                          53

SUMMARY OF ARGUMENT                                       53

ARGUMENT                                                  53

POINT OF ERROR NUMBER THREE

THE TRIAL COURT LACKED JURISDICTION
TO HEAR THE INSTANT CASE AND RENDER
A JUDGMENT BECAUSE THE CASE WAS NOT
TRANSFERRED TO ITS DOCKET                                 57

SUMMARY OF ARGUMENT                                                       57

ARGUMENT           57

PRAYER           60

CERTIFICATE OF COMPLIANCE           60

CERTIFICATE OF SERVICE           60

# INDEX OF AUTHORITIES

## CASES

Almanza v. State, 686 S.W. 2d 157
(Tex. Crim. App. 1985)                                    54

Becthard v. State, 767 S.W. 2d 423
(Tex. Crim. App. 1989)                                    55

Exparte Seidel, 39 S.W. 3rd 221
(Tex. Crim. App. 2001)                                    59

Garcia v. State, 901 S.W. 2d 731
(Tex. App. – Houston [14th Dist.]1995)                    59

Heath v. State, 817 S.W. 2d 335
(Tex. Crim. App. 1991)                                    59

Hoang v. State, 872 S.W. 2d 694
(Tex. Crim. App. 1993)                                    59

Jackson v. Virgina, 443 U.S. 307 (1979)                   47

Jimenez v. State, 32 S.W. 3rd 233
(Tex. Crim. App. 2000)                                    54, 55

Jimenez v. State, 992 S.W. 2d 633
(Tex. App. – Houston [1st. Dist.]1999)                    54

Malik v. State, 953 S.W. 2d 234
(Tex. Crim. App. 1997)                                    47

Marin v. State, 851 S.W. 2d 275
(Tex. Crim. App. 1993)                                    59

Mills v. State, 742 S.W. 2d 832
(Tex. App. – Dallas 1987)                                 59

Ovalle v. State, 13 S.W. 3rd. 774
(Tex. Crim. App. 2000)                                                55

Sparks v. State, WL 42285
(Tex. App. – Dallas 2001)                                            56

Warner v. State, Nos. P.D. – 1680-05, P.D. 16801-05
(Tex. Crim. App. 2008)                                               56

**CONSTITUTIONS**

Tex. Const. Art. V. section 12 (b)                                   57

**STATUTES**

Tex. Code Crim. Proc. Ann. Article 4.16                              58

Tex. Code Crim. Proc. Ann. Article 12.06                             57

Tex. Penal Code Ann. section 19.02 (b)(1) (2)                        46

Tex. Code Crim.Proc. Ann. Article 32.01                              58

Tex. Code Crim. Proc. Ann. Article 36.14                             54

Tex. Code Crim. Proc. Ann. Article 36.17                             54

Tex. Code Crim. Proc. Ann. Article 36.19                             54, 55

Tex. Code Crim. Proc. Ann. Article 37.07 section 4 (a)              53

Tex. Govt. Code Ann. section 24.003                                  58

Tex. Govt. Code Ann. section 508.149 (a)                            54

**RULES**

Tex. Rules Evidence 606 (b)                                          56

**STATEMENT OF THE CASE**

Appellant was charged with murder by an indictment which reads: In the name and by the authority of the State of Texas: The Grand Jury of Dallas County, State of Texas, duly organized at the July term, A.D., 2012 of the Criminal District Court Number Three, Dallas County, in said Court at said term, do present that one Pasco, Vincent defendant, on or about the 27th day of July A.D., 2012 in the County of Dallas and said State, did unlawfully then and there intentionally and knowingly cause the death of Derrick Brown, an individual , hereinafter called the deceased, by shooting the deceased with a firearm, a deadly weapon. And further did unlawfully then and there intend to cause serious bodily injury to Derrick Brown and did then and there commit an act clearly dangerous to human life, to-wit: by shooting the deceased with a firearm, a deadly weapon, and did thereby cause the death of Derrick Brown, an individual. (C.R. p. 10) The indictment includes a second paragraph alleging the existence of a prior felony conviction. (C.R. p. 10) Appellant pled not guilty to the indictment before the selected jury. (R.R. Vol. 3, p. 7) The jury found Appellant guilty of the indicted offense. (R.R. Vol. 4, p. 114) The jury found the enhancement paragraph true and set sentence at life in prison. (R.R. Vol. 4, p. 141)

## ISSUES PRESENTED

1.  The evidence is insufficient to prove the element of identity.

2.  The Trial Court erred by informing the jury about good conduct time.

3. The Trial Court lacked jurisdiction to hear the instant case and render a judgment because the case was not transferred to its docket.

## STATEMENT OF FACTS

Appellant was charged with murder by an indictment which reads:

> In the name and by the authority of the State of Texas: The Grand Jury of Dallas County, State of Texas, duly organized at the July term, A.D., 2012 of Criminal District Court Number Three, Dallas County, in said Court at said term, do present that one Pasco, Vincent, defendant, on or about the 27th day of July A.D., 2012 in the County of Dallas and said State, did unlawfully then and there intentionally and knowingly cause the death of Derrick Brown, an individual , hereinafter called the deceased, by shooting the deceased with a firearm, a deadly weapon.

> And further did unlawfully then and there intend to cause serious bodily injury to Derrick Brown and did then and there commit an act clearly dangerous to human life, to-wit: by shooting the deceased with a firearm, a deadly weapon, and did thereby cause the death of Derrick Brown, an individual.

(C.R. p. 10)

The indictment includes a second paragraph alleging the existence of a prior felony conviction. (C.R. P. 10)

Appellant pled not guilty to the indictment before the selected jury. (R.R. Vol. 3, p. 7)

**Demetrius Davison** was Derrick Brown's mother.  (R.R. Vol. 3, p. 18)

Ms. Davison knew that Derrick was working as a drug dealer in July of 2012.  (R.R. Vol. 3, p. 21)

Ms. Davison knew Derrick had a pending drug case at the time he was dealing drugs in July of 2012.  (R.R. Vol. 3, p. 22)

Ms. Davison knew that Derrick went by the nickname "Man."  (R.R. Vol. 3, p. 23)

Ms. Davison learned Derrick was shot through his nephew, Jonte Knox.  (R.R. Vol. 3, p. 27)

Ms. Davison rushed to the scene.  The police were there but the ambulance had not yet arrived.  (R.R. Vol. 3, p. 28)

A stranger who said her name was Twiggy approached Ms. Davison and told her someone named "Grinch" committed the crime.  (R.R. Vol. 3, p. 28)

10

Ms. Davison later told the police what Twiggy had told her.  (R.R. Vol. 3, p. 29)

**Shannon Wright** is Bianca (Twiggy) Wright's son.  (R.R. Vol. 3, p. 31)

Mr. Wright testified he is currently in jail for drug cases.  (R.R. Vol. 3, p. 31)

In July, 2012, Shannon frequented a "trap house" at 3926 South Central Expressway.  (R.R. Vol. 3, p. 32)

When Shannon went to the drug house he usually encountered "Grinch, Banks, and some friends."  (R.R. Vol. 3, p. 32)

At some point in July, 2012, Shannon introduced "Man" to the group. (R.R. Vol. 3, p. 32)

"Tron" knew "Man" prior to Shannon introducing him to "Grinch" and his other friends.  (R.R. Vol. 3, p. 32)

Shannon went to the drug house every other day.  Sometimes he spent the night.

But when he did he stayed up because he doesn't "sleep in places like that." (R.R. Vol. 3, p. 34)

On July 26, 2012, Shannon went to the drug house with Man. (R.R. Vol. 3, p. 34)

Grinch, Banks, Tron, and some other friends were present. (R.R. Vol. 3, p. 34)

Shannon stayed all night along with Man and Grinch. (R.R. Vol. 3, p. 35)

Shannon took a nap the next morning. He "heard some arguing. I guess when Banks came in, I heard some arguing. And that is when I got up. And we were arguing about, I guess, whose spot it was or whatnot and if he knew Man or not. You know what I'm saying? I was telling him Man was there because of Tron. We all know him,. And I guess he didn't like it. So we were arguing throughout the whole day." (R.R. Vol. 3, p. 35)

Shannon was asked to relate what happened next. He answered: "Well, we were doing business as usual. I believe Grinch went and served somebody, but I think he left his pack or whatever on the stool in the room where me and Man was." (R.R.

Vol. 3, p. 36)

"Pack" means drugs.  (R.R. Vol. 3, p. 36)

Shannon continued:

> And Banks came in arguing.  You know what I'm saying?  Or
> talking about something.  So me and him got to arguing  again
> about something coming up missing before.
>
> So me and him were arguing back and forth.  And he walked
> back to the back.  And the dope is still sitting on the stool.  I
> guess Grinch forgot about it.  And Man said he wanted to take
> it.  I'm saying, I told him not to, but he said he wanted to take
> it, so he ended up taking it.

(R.R. Vol. 3, p. 37)

Shannon was asked to describe what happened after Man stole the drugs.  He

answered:

> I had went up to … I went to the restroom.  Somebody knocked
> on the door while I was in the restroom, but then Grinch got up
> to go answer the door.  But he didn't have, you know what I'm
> saying, his drugs.
>
> And so he was walking around looking for it.  So I end up
> serving the person at the door.  So by this time, I am sitting
> down and he is still looking for it.  You know what I'm saying?
> He forgot where he put it.

And so he was like, have you seen it? And I was like No, I ain't seen it.  And so he was walking back and forth asking … talking to himself like, you know what I'm saying, he knew he left it somewhere but I guess he didn't remember where.

And so Man told him or asked him, uh, maybe you, uh, maybe you left it outside when you served that person that came to the door the first time.

And I guess he remembered.  He was like, No, because when I went out and served that person, I came back inside with it and I put it right here. You know what I'm saying.  And I was like, no, I didn't see it.  I was like, I didn't see.  So from then on, that point, there on, that is when the confusion started.

(R.R. Vol. 3, p. 37-38)

Shannon was asked what happened next.  He answered:

I think my sister called and said she was on her way, because it was her best friend birthday today.  She was on the way out there and she wanted to chill, chill with me, you know what I'm saying, and get high or whatever.  And I was like, yeah, come through.

And so when he left, he took the dope with him when he left.  And Banks came in and said, where did Man go?  And I like said, he will be back.  I said, he going to go get something to eat and he will be right back.  And he was like, all right.  You know what I'm saying?  He did a little light chuckle.  And like laughed and he walked back to the back.

And so Man was gone for quite a few minutes.

(R.R. Vol. 3, p. 39)

When Shannon's sister arrived he went with her to their mother's (Twiggy)

apartment, a few doors down.  (R.R. Vol. 3, p. 40)


Shannon was asked what happened next.  He answered:

> I go over there with them, and she asked me if I had some
> weed.  And I told her, Well, my partner, he said he would be
> back with some weed.  So just hold on for a minute.
>
> So I was back and forth from the spot to my momma house.
> So I called him and asked him where he was, and he said he
> was going to be on his way. And my sister and them had told
> me they had to leave because they were on a bus and they want
> to leave and go do some other stuff before the day ended.
>
> So I just ended up getting them some weed through the
> apartment complex and gave it to them and I chilled with them
> for a few minutes and they left and I went back to the spot.

(R.R. Vol. 3, p. 40-41)


Man came back an hour later.  Banks and Grinch were also present.

(R.R. Vol. 3, p. 41)


Shannon was asked what happened next.  He answered:

> Man show up, and I tell him that my sister and they came over
> because he wanted to see.  I told him my sister and them came
> over, and he was like where they was.  Where they at.  And I
> said they left.

But when we walked in, he told me that he had talked to Tron already and Tron was on their way over there. And so I said all right. And so he came back in and we listened to the music. Grinch siting there on the couch in the back room but he is just laying there … looks like he has got his eyes closed but he really looking at us the whole time.

So Man sitting on the little futon, the little couch he had in there, and I got music and I'm shaking my head. And Man asked me, we was like, is he mad? Is he mad? And just to play it off, I was shaking my head. I was like yeah. You know what I'm saying?

Yeah, like I'm listening to the music. You know what I'm saying? And Man just sat back and was shaking his head. And so then from there, that is when Banks come back in and he comes back in with some more drugs for him.

So, by this time… I'm still doing what I do. Me and Man still doing what we do. Grinch come up and ask me like that it is all right if I get off some of the drugs. And I was like, yeah, I ain't tripping. You know what I'm saying? Go ahead.

So then they come knock on the door. I get them or I tell Grinch to come get them, to come serve them. That is how we were doing it. And Banks come back up there. And he was like, say, Da-Da, you know, like if you let Banks get off of some of your drugs. Because you know he just lost a pack. But I already talked to Grinch about that.

So, by that time, me and Banks get in an argument again. Me and Banks never seen eye-to eye no way, so we get to arguing again. And then he go back to the back and they was talking amongst themselves, you know, and we was just sitting up there in the front.

But they still kind of mad that the little dope was gone. Because Banks make a statement like, I'm going to tell you

like this, the people I mess with, they ain't too happy that this dope came up missing. And then he go back to the back. And me and Man just sitting up front still doing our own thing.

(R.R. Vol. 3, p. 41-43)

Shannon continued:

I get up and go back to the restroom. I got the door open. I come out. Banks asked me where is Man. And I tell him where Man was, and he wants to know why he was here.

And he started talking about he don't know him and all this and I was like, well, he is here because I'm here. And if I'm here that mean Tron got me here. Then that mean we both here with Tron. You know what I'm saying?

And then he gets talking about the dope coming up missing and all this, and I telling him, we got our own dope. You know what I'm saying? Doesn't mean he got to steal nothing. He got his own dope. I don't know what happened to your dope. I'm tired of talking about it, so leave me alone. You know what I'm saying?

And me and Man got to arguing. And he just. All right man and he started laughing again. And I go back to the front and sat down.

(R.R. Vol. 3, p. 44-45)

A couple of hours later Man decided to take a nap. He told Shannon to wake him

up when Tron arrived. (R.R. Vol. 3, p. 46)

Banks told Grinch he was leaving to deliver some "weed" and to call him when Grinch was done doing what he was going to do.  (R.R. Vol. 3, p. 47)

Then Shannon's mother came to the door to get some money from Shannon.  (R.R. Vol. 3, p. 48)

Man was asleep when Twiggy knocked on the door.  (R.R. Vol. 3, p. 52)

Shannon gave Twiggy the money and stayed outside to smoke a cigarette.  He heard the door close behind him.  (R.R. Vol. 3, p. 53)

Shannon was asked what happened next.  He answered:

> Sit outside for a minute to smoke a cigarette.  And when I reached for the screen door, it was locked.  And then that is when I hear the door close. And so then I heard a door close and I hear some rambling.
>
> I reach on the screen door but it is locked and I asked Grinch why you lock the door? Open the fucking door.  But I don't hear nothing back.  I just hear a bunch of rambling. So I yanked the screen door open and break the lock. And I'm knocking on the door, beating on the door, and still no answer.  So about like … I guess like the ninth knock, I heard two gunshots go off.
>
> When I heard two gunshots go off, I looked at the blinds.

There is blood on the wall. I go to my mother's house, and I kick the door down. I kick her door down until I tell her, I think Grinch just shot Man.

I need to see the phone, because I left my phone in the house along with my gun I left in the house. And she gave me the phone,. And I called Tron to tell him what happened. But I guess he was so upset, he hung up. So I go back to the door and I kick it in.

When I kick it in, Man was laying on the couch the same way he was before I left out, but he was bleeding from his ear. And I seen Grinch running out the backdoor. He run out the back door. I run towards the back door.

He come out of the side of the stairs and I come back out the back door and meet him at the back of the apartments. Now he is in the parking lot on the phone. I yelled in the air, Grinch, what the hell you doing? What did you just do? He look up at me and he take off. And I didn't see him no more.

(R.R. Vol. 3, p. 54-55)

Shannon was present when the police arrived but they didn't talk to him. (R.R. Vol. 3, p. 63)

Shannon testified he told Man's relatives what happened. (R.R. Vol. 3, p. 64)

Shannon testified Banks left 30 minutes prior to the shooting. (R.R. Vol. 3, p. 66)

19

Tron was never present on the day of the shooting. (R.R. Vol. 3, p. 66)

On cross-examination, Shannon testified he had known Man, Grinch, Banks, and Tron for a month prior to the event. (R.R. Vol. 3, p. 70)

On July, 26, 2012, there was a big group at the drug house, including Shannon, Man, Tron, Grinch, Banks, and other friends. (R.R. Vol. 3, p. 71)

Grinch was at the dope house 24 hours a day. (R.R. Vol. 3, p. 72)

About a week after the event Shannon was summoned to the police station to be interviewed. (R.R. Vol. 3, p. 73)

Shannon told Detective Shinn the entire dispute was over $700.00. (R.R. Vol. 3, p. 74)

Shannon denied telling Shinn that Grinch had given him $700.00 worth of drugs and he was supposed to pay him later. (R.R. Vol. 3, p. 74)

Shannon did tell Shinn Grinch left some drugs laying around and they turned up missing.  (R.R. Vol. 3, p. 74)

Shannon told Shinn that he, Man, Grinch, Banks, and Tron all had guns.  (R.R. Vol. 3, p. 75-76)

Shannon agreed that the dispute started on the morning of July 27, 2012. (R.R. Vol. 3, p. 76)

Banks was the main person causing the difficulty.  (R.R. Vol. 3, p. 76)

Grinch was a quiet person who never said much.  He was not arguing.  (R.R. Vol. 3, p. 76)

Banks said "this is not ok with my people."  This is a reference to "the people he knew who he was in contact with were mad about what happened."  (R.R. Vol. 3, p. 77)

If a drug seller knows and trusts a buyer, drugs can be purchased on credit.  (R.R.

Vol. 3, p. 77)

Shannon testified Banks was complaining about missing drugs throughout the day. (R.R. Vol. 3, p. 78)

Shannon covered for Man, whom he saw steal the drugs. (R.R. Vol. 3, p. 79)

Shannon told Shinn he believed it was Banks who was behind Man being shot. (R.R. Vol. 3, p. 79)

Shannon never knew Tron to use the name, "Red." (R.R. Vol. 3, p 81)

There are three apartments between the drug house and Shannon's mother's apartment. (R.R. Vol. 3, p. 82)

Banks "left quite a few times" on the day in question. (R.R. Vol. 3, p. 83)

Banks left the drugs in the room where Shannon and Man were. When he came back they were gone. The only four people in the house were Banks, Grinch,

Shannon and Man.  Only Shannon and Man was under suspicion.  (R.R. Vol. 3, p. 84)

Shannon told Shinn that he and Grinch "got along fine and that ya'll had an understanding.  And if there was a problem, ya'll would just talk to each other and figure it out." (R.R. Vol. 3, p. 85)

When Twiggy knocked on the door, Man was asleep in that room.  (R.R. Vol. 3, p. 88)

Shannon's gun was locked inside the drug house.  (R.R. Vol. 3, p. 90)

The drug house has three rooms.  The room where Shannon and Man were, the room where Banks and Grinch were, and a room on the side with nothing in it. (R.R. Vol.3, p. 93)

When Shannon went back inside the drug house he discovered his gun was missing. (R.R. Vol. 3, p. 94)

Shinn asked Shannon if Tron ran the drug house.  He told him no.  (R.R. Vol. 3, p. 95)

On re-direct examination Shannon testified that Grinch was wearing either a white shirt or a black shirt at the time of the event.  (R.R. Vol. 3, p. 107)

Shannon told Shinn he had bought some marijuana from Grinch on the evening of July 26th, but had not paid for it.  (R.R. Vol. 3, p. 114)

Shannon told Shinn he panicked when the police arrived.  (R.R. Vol. 3, p.117)

**Twiggy Wright** has several children.  One of them is Shannon Wright.  (R.R. Vol. 3, p. 122)

Twiggy was in jail for drugs at the time she testified, but no pending cases.  (R.R. Vol. 3, p. 122)

Twiggy knows Tron.  She introduced Shannon to him.  (R.R. Vol. 3, p. 122)

In July, 2012, Twiggy lived at 3926 South Central Expressway. Tron ran the drug house in question a few doors down from her apartment. (R. R. Vol. 3, p. 123)

Twiggy knew Shannon worked at Tron's drug house. (R.R. Vol. 3, p. 124)

Twiggy was home on July 27, 2012. At some point she went to the drug house. Man, Shannon, Grinch, and Banks were present. (R.R. Vol. 3, p. 127)

Twiggy went to get money from Shannon. (R.R. Vol. 3, p. 129)

After Twiggy heard gunshots she saw Shannon. They went back to the drug house together. They banged on the door. Shannon was yelling Grinch's name. Twiggy saw Grinch coming out the back. Shannon yelled "Grinch, what the fuck?" (R.R. Vol. 3, p. 131)

Twiggy spoke to the police when they arrived. (R.R. Vol. 3, p. 132)

When Twiggy went to the drug house Grinch, Banks, Man and Shannon were there. (R.R. Vol. 3, p. 135)

Twiggy testified that Shannon did not ask to use her phone after the shooting. (R.R. Vo. 3, p. 143)

Shannon left before the police arrived. (R.R. Vol. 3, p. 147)

**David Andree** is a detective in the Crime Scene response section of the Dallas Police Department. (R.R. Vol. 3, p. 151)

Detective Andree took photos of the crime scene. They were admitted without objection as state's exhibit 19 through 28. (R.R. Vol. 3, p. 153)

**Sergeant Charles Young** testified he looked at intelligence bulletins regarding the instant case on July 28, 2012. As a result he began looking for a man named Chadrick Kennedy. (R.R. Vol. 3, p. 161-163)

Kennedy goes by the nickname Tron. (R.R. Vol. 3, p. 164)

Sergeant Young began to look for "Grinch." He suspected Vincent Pasco might be Grinch. Sergeant Young got a driver's license picture of Vincent Pasco. (R.R. Vol.

3, p. 177)

Young showed the photo of Pasco to a lady in the neighborhood named Shannon Lewis who identified the person depicted as being Grinch. (R.R. Vol. 3, p. 177-178)

On cross-examination Sergeant Young agreed that it was important to track down Chadrick Kennedy to talk to him about the murder since he was present and ran the drug house.  (R.R. Vo. 3, p. 184)

Grinch became a person of interest the day after Kennedy became a person of interest.  (R.R. Vol. 3, p. 184)

Sergeant Young testified he tried "extensively" to locate Kennedy but "[h]e wouldn't call me back."  (R.R. Vol. 3, p. 185)

Sergeant Young testified he knew nothing about "Banks."  (R.R. Vol. 3, p. 185-186)

Sergeant Young learned there were four people in the apartment near and at the

27

time of the event. They were Banks, Grinch, Man, and Shannon Wright who was called "DaDa." (R.R. Vol. 3, p. 186)

Sergeant Young testified it would be important to interview all these men before labeling one of them as a suspect. (R.R. Vol. 3, p. 188)

Sergeant Young testified "We'll never give up" looking for all three men to interview them. (R.R. Vol. 3, p. 188)

Sergeant Young's assignment was to find Kennedy and figure out who Grinch is. (R.R. Vol. 3, p. 191)

Sergeant Young testified that he is "off and on still looking for Tron." (R.R. Vol. 3, p. 192)

Once Sergeant Young identified Grinch his work in attempting to locate Tron ended as it related to the instant case. (R.R. Vol. 3, p. 193)

**Detective Colleen Shinn** is the lead detective in the instant case. (R.R. Vol. 3, p.

194-196)

Detective Shinn worked part time on the instant case because she was out for days at a time taking care of a sick family member. (R.R. Vol. 3, p. 197)

Detective Shinn did not go to the crime scene when the case came in. She stayed at the office to interview witnesses sent to her by other detectives. (R.R. Vol. 3, p. 198)

Shinn interviewed Jonte Knox. She believed she was being deceptive. (R.R. Vol. 3, p. 198-199)

Detective Shinn never did go to the crime scene. (R.R. Vol. 3, p. 199)

On the night of the offense "three to four" witnesses were brought downtown. Shinn interviewed one of them. (R.R. Vol. 3, p. 200)

Shinn testified Detective Maudlin interviewed Twiggy. (R.R. Vol. 3, p. 200)

29

Twiggy gave Detective Maudlin the fake name, Bianca Wright. (R.R. Vol. 3, p. 200-201)

Shinn was asked who the initial suspect was.  She answered:

> At first, we found out who the drug house was supposed to belong to which was a person by the name of Tron.  We didn't know who Tron was.  We got pictures from the scene.
>
> And I believe the tattoos say Etron or something on them.  And then I talked to the gang unit officer and he was able to research it and find out that Etron was Chadrick Kennedy. And so we already knew who he was.
>
> As far as the description of the shooter, the person, people that were giving a description were not inside the house at the time of the shooting and he didn't really match it.  I mean, it could be, maybe not.  So I wanted to eliminate him.  So I did eliminate him eventually because we were focusing on who was the person of interest because that drug house was supposed to be being his house.

(R.R. Vol. 3, p. 202)

Shinn was asked if she ever spoke to Tron.  She answered:

> No, I had called the phone number I had for him several times, but there was no answer.  No response. Sergeant Young was making contact with his family trying to … there was a point later on, in the investigation I found out that he was arrested.
>
> But by the time I found out that it was him who was arrested, I was not able to talk to him and he was running from the

marshals and he had warrants out for his arrest, and so, no, I did not.

(R.R. Vol. 3, p. 202-203)

Shinn was asked how Tron was eliminated as a suspect. She answered:

There's a female that came up to bring one of the witnesses up, brought Shannon Wright up, and she knows both Tron and Grinch.

And she confirmed that they were two separate people. And so since she is not a fact witness to the murder, I showed her a picture at the time. I didn't know who Grinch was, but I showed her a picture of Etron, and she said no, that is Tron, but it's not Grinch.

And I believe … I thought I showed one more person just one more picture, but they said it wasn't him either so I can't remember.

(R.R. Vol. 3, p. 203)

Shinn was asked who told her Grinch did the shooting. She answered:

Detective Thompson from the scene that night called and said that Ms. Wright … actually when I found out who she was, had approached, the mother of the complainant, and had told her that her son was there and what had happened.

And that that name came from Grinch there and Detective Thompson called and said that you can also look at Grinch.

(R.R. Vol. 3, p. 204)

After Shinn was told Grinch was Vincent Pasco she had a lineup prepared, and showed it to Shannon Wright. (R.R. Vol. 3, p. 205)

Wright identified Pasco in the lineup. Shinn then asked the District Attorney's office liaison if she could get a warrant and they said yes. (R.R. Vol. 3, p. 206-207)

On cross-examination Shinn testified she was assigned the case shortly after the 911 call came in. (R.R. Vol. 3, p. 213)

Jonte Knox is the complaining witness' cousin. (R.R. Vol. 3, p. 216)

Shinn looked at Jonte's phone and found Tron's phone number in it. (R.R. Vol. 3, p. 216-217)

Shinn found out on the night of the event that Twiggy is Shannon Wright's mother. R.R. Vol. 3, p. 217)

The complaining witness's mother told Detective Thompson that Shannon Wright's mother, Twiggy told her that Grinch was the shooter. (R.R. Vol. 3, p. 218)

Detective Maudlin failed to record his interview with Twiggy.  (R.R. Vol. 3, p. 219)

Shinn was asked to look at Maudlin's notes to see if Twiggy identified Grinch as going by "Red."  (R.R. Vol. 3, p. 219-220)

Shinn testified that "Grinch also goes by Red and has tattoos."  (R. R. Vol. 3, p. 220)

Tron goes by "Red."  (R.R. Vol. 3, p. 220)

Tron was eliminated as a suspect on the date Shinn interviewed Shannon Wright. (R.R. Vol. 3, p 223)

Wright appeared for the interview accompanied by his girlfriend, Rosalind Hopkins.  (R.R. Vol. 3, p. 223)

At the time Shannon was interviewed the question was whether Tron was Grinch. (R.R. Vol. 3, p. 223)

Shinn was asked if Tron was eliminated when it was determined he was not Grinch.

She answered:

> Well, that is part of it. But the description, you know, those people are off. I'm looking at a description. I have also been told that he had also just run the drug house and that they were two different people.
>
> But I have been told so much stuff, I need to confirm one way or the other if he is Grinch, if he isn't Grinch, you know what I mean? So, he was eliminated that night as being Grinch in my opinion.

(R.R. Vol. 3, p. 224)

Shinn was asked if Rosalind Hopkins saying that Kennedy was not Grinch caused him to be eliminated as a suspect. She answered :

> Well, Rosalind Hopkins was an independent witness. I mean, she has nothing to do with the case for as far as a fact witness. So instead of showing a bunch of lineups with incorrect people maybe to other people, she said she knew both, and there was a difference. And we were also getting word that they were two different people. I eliminated… I said is that Grinch and I showed her the picture of Tron just to be sure of it and she didn't say yes.

(R.R. Vol. 3, p. 225)

Shinn testified that Wright and Rosalind were observed discussing how to protect Tron from detection during their interviews. (R.R. Vol. 3, p. 225)

34

From talking to Shannon, Shinn couldn't discern whether the dispute was over

$700.00 cash or $700.00 worth of drug, or both.  (R.R. Vol. 3, p. 228)

After Shannon was interviewed Shinn decided Grinch was the suspect.  (R.R. Vol.

3, p. 229)

Shinn was asked what she did to investigate Bank's involvement.  She answered:

> Well, I was never told that Banks was in the room when the
> murder occurred.  I was told that he had left prior to it
> occurring.
>
> And his description as far as the person running from the scene
> with a gun in his waistband does not match Banks at all.  Banks
> is a totally different description.

(R.R. Vol. 3, p. 233-234)

Banks was eliminated as a suspect on the basis that he did not match the description

of the man seen leaving the apartment complex immediately after the shooting.

(R.R. Vol. 3, p. 234)

**Heather Thomas** is a firearm and tool mark examiner.  (R.R. Vol. 3, p. 238)

35

Ms. Thomas' report was admitted without objection as state's exhibit 30. (R.R. Vol. 3, p. 241)

Ms. Thomas was unable to determine whether the submitted items were fired from one or more than one gun. (R.R. Vol. 3, p. 245-246)

**Mike Bosillo** is the custodian of records for Metro PCS cell phone company in Richardson, Texas. (R.R. Vol. 3, p. 247)

State's exhibit 32 is a cell phone map. It was admitted without objection. (R.R. Vol. 3, p. 258)

3926 South Central Expressway is on the map along a "cell site location." Tower 154 picked up cell phone calls between 6:30 and 7:00 p.m. on the date in question. (R.R. Vol. 3, p. 259)

Tower 217 picked up the cell phone at 6:46 p.m. . (R.R. Vol. 3, p. 264)

**Zina Shaw** was dating Appellant at the time of the event. (R.R. Vol. 3, p. 277)

Zina knew Appellant to go by the name Grinch.  (R.R. Vol. 3, p. 277)

On July 27, 2012, Appellant called Zina.  He told her "it was me or him", "he tried to hoe me."  (R.R. Vol. 3, p. 279)

On cross-examination Zina testified the complaining witness was her friend.  (R.R. Vol. 3, p. 280)

Zina testified she has known Tron for over 10 years.  (R.R. Vol. 3, p. 280)

Zina was asked to look at State's exhibit 31 and locate the call she testified Appellant placed to her.  She did not find a record of the call.  (R.R. Vol. 3, p. 287-289)

The medical examiner's report was admitted without objection as State's exhibit 33.  (R.R. Vol. 3, p. 291)

The State rested.  (R.R. Vol. 3, p. 292)

Appellant called **Shannon Wright**. (R.R. Vol. 4, p. 7)

On the day of the shooting Shannon woke up to an argument about his failure to pay Appellant $ 20.00 for marijuana he bought from him. (R.R. Vol. 4, p. 13)

Shannon was asked if he told Shinn about the dispute over the stolen crack. He replied: "Yes, I told her." (R.R. Vol. 4, p. 14)

Shannon also told Shinn there was an argument over who had the best crack. (R.R. Vol. 4, p. 16)

Shannon testified he told Shinn the argument was about $700.00 worth of stolen crack. A portion of Shannon's interview was played. (R.R. Vol. 4, p. 16-18)

Shannon told Shinn that he stepped out onto the balcony when his mother came over for money. (R.R. Vol. 4, p. 19)

Shannon testified that he was outside for 1 minute and when he went to go back inside the door was locked. He knocked, and 15 to 20 seconds later he heard

gunshots.  (R.R. Vol. 4, p. 20-21)

Shannon testified he told Detective Shinn he ran to his mother's apartment to get a phone after the gunshots. (R.R. Vol. 4, p. 22)

Shannon told Shinn he heard gunshots and broke down the door.  (R.R. Vol. 4, p. 24)

Shannon never told Shinn he got a phone and called Tron.  (R.R. Vol. 4, p. 24)

Shannon never told Shinn he returned to the apartment and banged on the door eight or nine times.  (R.R. Vol. 4, p 24)

Shannon testified he did not tell Shinn his mother was outside with him when he heard the gun shots. (R.R. Vol. 4, p. 25)

The video was played.  Shannon admitted he told Shinn he was outside with his mother when they heard the shots.  (R.R. Vol. 4, p. 25)

Shannon testified on direct examination that he stayed at the scene and talked to the police. He told Detective Shinn he panicked and left the scene before the police arrived. (R.R. Vol. 4, p. 26)

Shannon testified it took 5 minutes for him to run to his mother's house, tell her what happened, borrow her phone, call Tron, go back and knock on the door eight or nine times, break down the door and see Grinch running down the hallway. (R.R. Vol. 4, p. 29)

At one point Shannon testified Banks left the apartment 30 minutes before the shooting. At another point he stated Banks left when the police arrived. (R.R. Vol. 4, p. 33)

Shannon admitted that Tron was due to arrive at the apartment about the time that Shannon's sister called to come get marijuana. (R.R. Vol. 4, p. 34)

On re-direct examination Shannon stated the defense counsel was, "making me trip. Pissing me off." (R.R. Vol. 4, p. 37)

40

The interview of Shannon was admitted without objection as State's exhibit 42.

(R.R. Vol. 4, p. 39)

State's exhibit 42 was published. (R.R. Vol. 4, p. 40)

The defense rested. (R.R. Vol. 4, p. 40)

There were no objections to the jury charge. (R.R. Vol. 4, p. 40)

In rebuttal the State called **Jordan Price**. (R.R. Vol. 4, p. 44)

On July 27, 2012, Price went to a family gathering near 3926 South Central Expressway. (R.R. Vol. 4, p. 45-46)

Price knew the apartment in question was a dope house. (R.R. Vol. 4, p. 46)

Price was asked if he heard "something" that afternoon. He answered:

> You know, I heard … like, well everybody heard it. It was like a gunshot, you know. We had the music playing a little bit, but not too loud to where we will still hear everything, you know.

41

So after we hear the boom, you know, everybody scattered outside. And there was a couple of people that was already outside, you know.

Me and my uncle… well, I saw … I saw the dude with bright skin, like he was Mexican or Puerto Rican, or whatever, you know, seen him coming from the back way of the apartment.

Like I'm was on the front side, he was coming from the back side where the parking lot was at, you know. And he ran in front of us and go across the freeway.

But on his way, I see a gun tucked in the back of his pants or whatever, you know. So my uncle… the first thing my uncle did was call the police, and just somebody came in and was talking about … the kinfolk or somebody got shot in the head, or whatever, you know, so…

(R.R. Vol. 4, p. 47-48)

The prosecutor pointed out to Price that in his police statement he does not say he heard the gunshots. (R.R. Vol. 4, p. 49)

Police was shown a photo lineup. He identified Appellant. (R.R. Vol. 4, p. 50-51)

Price testified that the truth is that he heard the gunshots rather than what he told Detective Maudlin during the interview. (R.R. Vol. 4, p. 60-61)

42

The video of Price's interview shows he told the police that his uncle's friend told him someone was shot in the back. (R.R. Vol. 4, p. 61)

The only thing Price saw was a man running across the freeway. Everything else he told the police was what he heard on the street. (R.R. Vol. 4, p.64)

Price testified the man he saw running had a ponytail. He also testified the only man in the photo lineup with a ponytail was Appellant. (R.R. Vol. 4, p. 68)

The photo selected by Price, is marked with the notation, "I'm not sure." (R.R. Vol. 4, p. 70)

**Chadrick Kennedy** goes by the nickname Tron. (R.R. Vol. 4, p. 71)

Kennedy testified he did not kill Brown. (R.R. Vol. 4, p. 72)

Kennedy testified that on July 27, 2012, his phone number was 214-434-4359. (R.R. Vol. 4, p. 72)

Kennedy denied the apartment in question was his dope house. (R.R. Vol. 4, p. 74)

There were no drugs at that apartment. (R.R. Vol. 4, p. 75)

The State rested. (R.R. Vol. 4, p. 77)

Both sides closed. (R.R. Vol. 4, p. 78)

The jury found Appellant guilty of the indicted offense. (R.R. Vol. 4, p. 114)

The enhancement allegation contained in the indictment was presented to the jury. Appellant pled not true. (R.R. Vol. 4, p. 116-117)

**Latonia Gibson** is a fingerprint expert with the Dallas Sheriff's Department. She compared Appellant's fingerprints with those included in a penitentiary packet evidencing the alleged prior conviction. Ms. Gibson concluded there was a match. (R.R. Vol. 4, p. 118-121)

**Demetrius Davison** is Derrick Brown's mother. She testified about how his death

has affected her.  (R.R. Vol. 4, p. 122-124)

The State rested.  (R.R. Vol. 4, p. 125)

There were no objections to the jury charge.  (R.R. Vol. 4. P. 126)

The jury found the enhancement paragraph true and set sentence at life in prison.
(R.R. Vol. 4, p. 141)

**POINT OF ERROR ONE**

**THE EVIDENCE IS INSUFFICIENT TO PROVE THE**

**ELEMENT OF IDENTITY**

**SUMMARY OF ARGUMENT**

The only contested issue in this murder case is identity. No rational jury could have

found Appellant committed the crime beyond a reasonable doubt.

45

# ARGUMENT

Appellant was charged with murder by an indictment which reads:

> In the name and by the authority of the State of Texas: The
> Grand Jury of Dallas County, State of Texas, duly organized at
> the July term, A.D., 2012 of Criminal District Court Number
> Three, Dallas County, in said Court at said term, do present
> that one Pasco, Vincent, defendant, on or about the 27th day of
> July A.D., 2012 in the County of Dallas and said State, did
> unlawfully then and there intentionally and knowingly cause
> the death of Derrick Brown, an individual , hereinafter called
> the deceased, by shooting the deceased with a firearm, a deadly
> weapon.
>
> And further did unlawfully then and there intend to cause
> serious bodily injury to Derrick Brown and did then and there
> commit an act clearly dangerous to human life, to-wit: by
> shooting the deceased with a firearm, a deadly weapon, and did
> thereby cause the death of Derrick Brown, an individual.

Murder, as charged, is proscribed by Tex. Penal Code Ann. sections 19.02 (b)(1)

and (2) which read:

> (b) A person commits an offense if he:
>
> (1) intentionally or knowingly causes the death of an
> individual;
>
> (2) intends to cause serious bodily injury and commits an act
> clearly dangerous to human life that causes the death of a n
> individual[.]

The application paragraph of the jury charge authorized conviction as follows:

> Now, if you find from the evidence beyond a reasonable doubt

46

that on or about the 27th day of July, 2012, in Dallas County, Texas, the defendant, Vincent Pasco, did unlawfully then and there intentionally or knowingly cause the death of Derrick Brown, an individual, hereinafter called deceased, by shooting the deceased with a firearm, or did unlawfully then and there intend to cause serious bodily injury to Derrick Brown and did then and there commit an act clearly dangerous to human life to-wit: by shooting the deceased with a firearm, a deadly weapon, and did thereby cause the death of Derrick Brown, an individual, then you will find the defendant guilty of murder charged in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant.

Appellant argues the evidence is insufficient to prove the element of identity. On appeal the evidence is legally insufficient if, when examined in the light most favorable to the verdict, no rational jury could have found the elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979). The Court also stated that this constitutional standard "must be applied with explicit reference to the substantial elements of the criminal offense as defined by law." Id. at 32 n.16. The elements or facts necessary to constitute a particular crime are determined by state law. Under Texas state law, the sufficiency of the evidence is measured "by the elements of the offense as defined by the hypothetically correct jury charge for the case." Malik v. State, 953 S.W. 2d 234 (Tex. Crim. App. 1997).

The murder was committed in a crack house at an apartment complex in south

47

Dallas. No one witnessed the crime. All of the witnesses who testified are either crack addicts, crack dealers or both.

Shannon Wright was the state's chief witness. At the time of his testimony Wright was in jail for drug cases. At the time of the murder in July, 2012, Wright was a crack addict and part time crack dealer who worked at the crack house for the owner of the business, Chadrick Kennedy, who calls himself, "Tron." On July 26, 2012, Wright took Derrick Brown, who called himself "Man" over to the crack house to smoke and sell crack. When they arrived they joined Tron, a man named Banks, Appellant, who calls himself "Grinch" and some other friends. After an unknown period of time, Tron and the friends left leaving Appellant, Brown, and Wright alone at the crack house.

The next morning an issue arose between Banks, Appellant, and Wright over Brown's continued presence. Wright informed Banks and Appellant that Brown was with him and that he was friends with Tron. However tensions remained high throughout the day. At some point Appellant left a quantity of crack on a chair in the room where Wright and Brown were hanging out. While Appellant was at the door selling crack Brown decided to steal the drugs he had left in the room. Later, Appellant searched for the missing crack but could not find it. Both Wright and Appellant denied taking it. Tensions continued to rise among everyone present.

Wright's sister called to come get high.  When she arrived Wright went with her over to their Mother Twiggy's apartment.  Meanwhile Appellant left to get something to eat.  When Wright got back to the crack house Banks and Appellant were present and Brown returned about an hour later.  When he arrived he told the others that Tron was on the way.  Brown did not know that Tron had been informed that he was suspected of stealing his crack. Banks and Wright then began to argue again over the stolen crack. It was obvious that either Brown or Wright had stolen it. Then according to Wright he and Appellant also began to argue.  When all the bickering subsided Brown decided to take a nap until Tron arrived. Wright testified Banks decided to leave to go deliver some marijuana, then he told Appellant to call him when he was finished doing what he was going to do.

Then Twiggy came by to get some money from Wright.  He stepped outside with her to smoke a cigarette. While he was outside Wright heard the gunshots. When he went to go back inside he found that the door was locked.  According to Wright he went to his mother's house to call the police and Tron. Wright testified he reached Tron but he was so upset he hung up.  Wright went back to the crack house and broke in.  He saw Brown lying on the couch bleeding from his ear. He had been shot to death while he slept.

According to Wright he saw Appellant run out of the back door and into the

parking lot. Wright called to Appellant but he was on the phone and ignored him. Appellant left and Wright didn't see him anymore.

To bolster Wright's testimony the state called his mother Twiggy to testify. Twiggy is a crack addict who lives a couple of doors down from Tron's crack house. She has known Tron for years and got Wright a job working for Tron at the crack house. At the time she testified Twiggy was in jail for drug offenses, but claimed to have no pending cases. Twiggy's testimony was tailored to substantively match Wright's. She testified she went to the crack house to get money from her son. While she was standing outside with Wright she too heard gunshots and in turn also saw Appellant leaving the scene.

After the shooting Twiggy stayed at the scene after Wright fled before the police arrived. Twiggy saw Ms. Davison arrive at the scene and told her that Appellant shot her son. Ms. Davison in turn repeated Twiggy's assertions to police which led to Appellant's arrest and prosecution.

Sergeant Charles Young was assigned the task of looking for the Grinch and Tron. He found the Grinch (Appellant) but he gave up finding Tron (Chadrick Kennedy) when he failed to return phone calls. Sergeant Young never did look for Banks because he was never told to do so.

Detective Colleen Shinn was the lead homicide detective assigned to the case.

She worked on it part time. She never went to the crime scene. Detective Shinn did interview Shannon Wright and showed him a photo lineup which included Appellant. Wright of course identified Appellant as being Brown's killer. Wright appeared for his interview accompanied by his girlfriend, Rosalind Hopkins. Shinn had the two put in a room together and recorded their conversation. During that conversation Wright and Hopkins discuss how to protect Tron from suspicion. Shinn testified that she considered Hopkins to be "an independent" witness, implying she had nothing to gain by lying. It was Hopkins' statement to Shinn that Tron was not the same person as the guy called Grinch that caused her to eliminate him as a suspect and arrest Appellant.

From the foregoing, Appellant argues the state's case comes down to the police taking the word of Twiggy, Shannon Wright and Rosalind Hopkins to choose to file a case against Appellant for the murder of Brown. Nothing more than a cursory "investigation" was conducted. Banks was never looked for. Tron didn't return phone calls and besides Rosalind said it wasn't him so he was abandoned as a suspect. Moreover, the police ignored the obvious problems with their choice of Appellant as the suspect. The problem is Tron. The crack house was owned by Tron. It was Tron's crack that Appellant and Wright stole and smoked. It was Tron to whom Banks and Appellant reported the theft. Tron was on the way to the crack

house when Brown laid down to take a nap. It was Tron that Wright and Hopkins were conspiring to protect even up to the moments before they were interviewed by the police.

Further, the witnesses who identified Appellant as the killer all had something to gain. Twiggy was beholden to Tron for her crack and her son's job as a part time crack dealer. Twiggy was also protecting her son from suspicion by telling Brown's mother at the scene, the police and later the jury that she heard the shots and then saw Appellant leave the crack house. Shannon Wright was also beholden to Tron for his crack habit, as well as a job. Shannon Wright also had an interest in having Tron believe he had nothing to do with the theft, otherwise he too would be killed. Likewise, Wright had an interest in avoiding prosecution for a crime he would be considered being a party to if Tron were arrested. Rosalind Hopkins had a stated interest in protecting Tron for her own reasons. She also had an interest in protecting her boyfriend Shannon Wright from prosecution.

It is axiomatic that for a verdict to be considered rational it must be reasonable. In the instant case the jury was handed a murder case that was very shoddily investigated and with witnesses who were all motivated by self- interest and not the truth. The guilty verdict this evidence produced should not be affirmed. It would be incorrect and therefore unjust to do so.

**POINT OF ERROR TWO**

**THE TRIAL COURT ERRED BY INFORMING THE JURY ABOUT GOOD CONDUCT TIME**

**SUMMARY OF ARGUMENT**

Appellant was ineligible for good conduct time. The Trial Court erred by instructing the jury to the contrary. Appellant suffered egregious harm because of the erroneous instruction.

**ARGUMENT**

Appellant was indicted for and found guilty to murder. The Court's charge at punishment told the jury that "[u]nder the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through award of good conduct time." This charged tracked article 37.07 section 4 (a) of the Code of Criminal Procedure. Appellant did not object to the charge.

The 37.07 instruction is an incorrect statement of the law when given where the defendant is not eligible to accrue good conduct time because of the nature of his

conviction. In the present case Appellant was convicted of burglary of a habitation.

He is precluded by the Government Code from receiving good conduct time credit.

Tex. Govt. Code Ann. section 508.149 a. The charge should not have been given in

this case. It was misleading to the jury. As such, giving it was error. Jimenez v.

State, 992 S.W. 2d 633 (Tex. App. – Houston [1st. Dist.] 1999); Jimenez v. State,

32 S.W. 3rd 233 (Tex. Crim. App. 2000) (assuming error, deciding standard for

harm analysis).

The requirements of objecting to the Court's charge are set out in article 36.14

through 36.17 of the Code of Criminal Procedure. The standard of review for

charge error is set out in 36.19 which reads:

> Whenever it appears by the record that any requirement
> of article 36.14, 36.15, 36.17, and 36.18 has been
> disregarded, the judgment shall not be reversed unless
> the error appearing from the record was calculated to
> injure the rights of the defendant, or unless it appears
> from the record that the defendant has not had a fair
> impartial trial. All objections to the charge and to the
> refusal of specific charges shall be made at the time of
> the trial.

Tex. Code Crim. Proc. Ann. article 36.19. The instant case involves a violation of

the article 36.14 requirement that the judge accurately instruct the jury on the law

applicable in this case. In Almanza v. State, 686 S.W. 2d 157 (Tex. Crim. App.

1985) the Court of Criminal Appeals decided that article 36.19 established two

standards of review for errors in the Court's charge. If the defendant objected to the error, the statutory standard of harm as interpreted by the Court is whether "some harm" is shown.  This standard doesn't apply where the objection is made to charge error that violates the United States Constitution.  In the instant case reversal is required unless the error was harmless beyond a reasonable doubt. Becthard v. State, 767 S.W. 2d 423, 430 (Tex. Crim. App. 1989).  In Jimenez v. State, 32 S.W. 2d 233,237 (Tex. Crim. App. 2000) the Court of Criminal Appeals claimed that this standard does not apply to non-structural constitutional error to which there was no objection.

The Court held that were an erroneous parole instruction is not the subject of an objection the defendant must show that he was denied a fair trial.  See, article 36.19; Id., at 238.  Because it is difficult, if not impossible, to show actual harm caused by an erroneous jury instruction, such a showing is not required. All, Appellant must do is suggest how prejudice may have occurred, and at the point, the appellate court makes its own assessment as to whether the defendant was harmed to the point of receiving an unfair trial.  Ovalle v. State, 13 S.W. 3rd 774 (Tex. Crim. App. 2000).  The appellate court does not resolve the issue by asking whether the defendant met a burden of persuasion that he suffered actual harm. Neither party has a burden to prove harm because there ordinarily is no way to

prove actual harm.  Id.; Sparks v. State, WL 42285 (Tex. App. – Dallas 2001); Warner v. State, Nos. P.D. – 1680-05, P.D. – 16801-05 (Tex. Crim. App. 2008).

Appellant suggests that the charge, which erroneously led the jury to believe that under existing law it was possible for him to be awarded a sentence reduction through the award of good conduct time where he was not eligible for such a reduction was egregious error which was incapable of being cured by the instruction that good conduct time cannot be applied in assessing punishment.  This so called mitigating instruction does nothing to correct the earlier misstatement about the general rules of good conduct time credit related to mandatory supervision and parole.  Furthermore, there will never be any evidence that the jury was actually misled by such an instruction. The jury cannot be impeached in this manner. Nor can such an issue be raised and advanced in a motion for new trial. See, Tex. Rules Evidence 606 (b).  Therefore, considering the record as a whole, the entire jury charge, the nature of the offense, the punishment assessed, and the impossibility of accurately assessing harm under the Rules of Evidence, Court should reverse this case.

# POINT OF ERROR THREE

## THE TRIAL COURT LACKED JURISDICTION TO HEAR THE INSTANT CASE AND RENDER A JUDGMENT BECAUSE THE CASE WAS NOT TRANSFERRED TO ITS DOCKET

## SUMMARY OF ARGUMENT

Criminal District Court Number Seven had no jurisdiction over this case. Its judgment is void.

## ARGUMENT

The Texas Constitution provides that a court is vested with jurisdiction over a criminal case by the presentment of an indictment or information. Tex. Const. Art. V. section 12 (b). An indictment is presented when it has been duly acted on by the grand jury and received by the Trial Court. Tex. Code Crim. Proc. Ann. Article 12.06. Statutory provisions also codify the necessary result, implied by article V section 12 above that the Trial Court lacks jurisdiction in the absence of proper

57

presentment. <u>Tex. Code Crim. Proc. Ann. Article 32.01</u> (requiring an indictment to be dismissed if not presented to the Trial Court by date certain). Once the indictment is presented jurisdiction is exclusive in the receiving Court unless it is transferred to another Court. <u>Tex. Code Crim. Proc. Ann. Article 4.16</u>.

The only mechanism for transferring the power to try a felony is by an order of transfer combined with an order of receiving. Combined, these constitute a written agreement between the two courts involved. The transferring Court issues an order formally transferring jurisdiction over the case. The second Court accepts the case by issuing a formal order receiving. <u>See</u>, <u>Tex. Govt. Code Ann. Section 24.003</u>.

The instant case was presented to Criminal District Court Number Three of Dallas County, Texas. Jurisdiction was thus invested in that Court. The instant case later appeared on Criminal District Court Number Seven where it remained through the entry of judgment. However, there is nothing in the record showing that jurisdiction was ever transferred by Criminal District Court Number Three to Criminal District Court Number Seven. Therefore it appears that the Criminal District Court Number Three "retains" jurisdiction, just as <u>article 4.16 </u>states. Appellant contends that Criminal District Court Number Seven never acquired jurisdiction in this matter.

Lack of jurisdiction over a case renders a Trial Court's judgment void. <u>Ex </u>

parte Seidel, 39 S.W. 3rd 221 (Tex. Crim. App. 2001); Hoang v. State, 872 S.W. 2d 694 (Tex. Crim. App. 1993). A defect which renders a sentence void may be raised for the first time of appeal. Heath v. State, 817 S.W. 2d 335 (Tex. Crim. App. 1991).

The right to be tried in a Court that has properly acquired jurisdiction over a case is absolute. See, Marin v. State, 851 S.W. 2d 275 (Tex. Crim. App. 1993). Such a right to cannot be waived or forfeited, even with consent. Id. Implementation is not optional, it is always required. Id. at 279. Error in this regard is not subject to further analysis. Thus, a defendant may complain about this violation of an absolute right on appeal without having raised the question in the Trial Court. Id. at 280.

Appellant now complains that Criminal District Court never acquired jurisdiction over the instant case, but he acknowledges that authority is against his position. See, e.g., Mills v. State, 742 S.W. 2d 832, 835 (Tex. App. – Dallas 1987); Garcia v. State, 901 S.W. 2d 731,732-733 (Tex. App. – Houston [14th. Dist.]1995). These cases all hold that the present issue must be raised the trial counsel or it is waived. However, they simply cite to their antecedents without any Constitutional or statutory authority for the proposition that a jurisdictional defect can be cured by procedural default.

## PRAYER

WHEREFORE Premises Considered, Appellant prays that this Honorable Court

reverse and acquit or remand this cause to the Trial Court for further proceedings

Respectfully submitted:

/s/ Allan Fishburn
Allan Fishburn
State Bar Number: 07049110
211 North Record Street
Suite 450
Dallas, Texas 75202
Telephone (214) 761-9170
Facsimile (214) 742-7313
allanfishburn@yahoo.com

## CERTIFICATE OF COMPLIANCE

I hereby certify the foregoing document contains 10, 711 words.

/s/ Allan Fishburn
Allan Fishburn

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief was tendered to

District Attorney's Office located at 133 North Riverfront Boulevard, Dallas,

Texas 75207 on this the 31st of December, 2014.

/s/ Allan Fishburn
Allan Fishburn